## In re SMITH & WESSON HOLDING CORP. SEC. LITIG.

C.A. No. 07–cv–30238–MAP.

United States District Court,
D. Massachusetts.

March 26, 2009.

David A. Rosenfeld, Samuel H. Rudman, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Adam M. Stewart, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Bryan A. Wood, Berman De-valerio, Boston, MA, for Plaintiffs.

Brian J. Schulman, E. Jeffrey Walsh, Greenberg Traurig, LLP, Phoenix, AZ, Francis D. Dibble, Jr., Jeffrey E. Poindexter, Katherine A. Robertson, Bulkley, Richardson & Gelinas, LLP, Springfield, MA, Jason C. Moreau, Jennifer M. Foster,

John A. Sten, Greenberg Traurig LLP, Boston, MA, for Defendants.

Jeffrey C. Block, Berman DeValerio Peas Tabacco Burt & Pucillo, Boston, MA, Theodore M. Hess–Mahan, Hutchings Barsamian, Cross and Mafidelcorn, LLP, Wellesley Hills, MA, for Movants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT (Dkt. No. 53)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiffs [1], a class of investors, allege that Defendant Smith & Wesson Holding Corp. ("Smith & Wesson") and three individual Defendants, members of Smith & Wesson's management, made a series of public statements in which they fraudulently misrepresented demand for Smith & Wesson products.

Defendants have moved to dismiss the complaint on three grounds: (1) the "Safe Harbor" provisions of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–5, immunize Smith & Wesson and its management from liability for "forward-looking statements"; (2) the complaint fails to meet the PSLRA's heightened pleading standards for non forward-looking statements; and (3) the complaint fails to state viable claims against one of the individual Defendant executives.

The complaint contains allegations based mainly on forward-looking statements, but also to a lesser degree on allegedly false statements of historical fact. The statuto-

---

1. On April 15, 2008, the court appointed the Oklahoma Firefighters Pension and Retirement System as Lead Plaintiff and consolidated *Cranford v. Smith & Wesson Holding Corp. et al.*, C.A. 08–cv–30001–MAP, and *Trudelle v.* *Smith & Wesson Holding Corp. et al.*, C.A. 08–cv–10028–MAP, into *In re Smith & Wesson Holding Corp. Sec. Litig.*, C.A. 07–cv–30238–MAP. Dkt. No. 41.

ry safe harbor provisions of the PSLRA immunized Defendants from liability for forward-looking statements because they included meaningful cautionary statements. Plaintiffs, however, have offered sufficient, albeit thin, allegations of Defendants' intentionally false statements of present or historical fact to survive the motion to dismiss, with one exception. As to Defendant Barry Monheit, there is no evidence that he knew of the falsity of Defendants' statements. His sales of stock do not give rise to an inference of scienter because they were made pursuant to statutorily protected plans.

For the reasons explained in more detail below, Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint will be denied except as to Barry Monheit.

## II. *BACKGROUND*

Plaintiffs allege that Defendants misled investors into believing that strong consumer demand for Smith & Wesson products supported high growth projections issued at the start of the relevant Class Period, roughly June through December 2007. Smith & Wesson's stock price increased more than 10% during this period, and Plaintiffs allege that one of the individual Defendant executives engaged in illegal insider trading while other executives were in line to receive stock-based compensation and bonuses.

Plaintiffs assert two claims against two sets of Defendants. First, they assert claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against Smith & Wesson, Chief Executive Officer Michael Golden, Chief Financial Officer John Kelly, and Chairman of the Board Barry Monheit. These claims, as noted, rest upon allegedly false and misleading statements regarding Smith & Wesson's sales and demand projections. Second, Plaintiffs assert claims against individual Defendants under Section 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78t(a). They allege that the individuals were in controlling positions in Smith & Wesson and had the power and authority to cause the firm to engage in the allegedly fraudulent conduct. Dkt. No. 47, Compl. at ¶¶ 167–75.

The complaint rests on two types of evidence: (1) a series of public statements by Defendants from June through December 2007; and (2) Smith & Wesson's internal sales reports and statements by confidential insider sources, which allegedly show that Defendants had actual knowledge of the falsity of their public statements.

### A. *Smith & Wesson's Sales Model*

Smith & Wesson manufactures and sells firearms and firearm-related products. It generally sells to unaffiliated distributors who then sell its products to law enforcement agencies, firearms dealers, and other retailers. The company maintains one team of salespeople for distributors and another to service downstream dealers and retailers.

With this structure, Smith & Wesson does not realize revenue until orders are finalized when end-users buy its products. Since the company often takes orders months in advance of actual purchases, it maintains a number of sales tracking tools to analyze consumer demand, which will be described in detail, *infra.*

Plaintiffs allege that, from these sources, Defendants knew that consumer demand for Smith & Wesson products was falling in the first half of calendar year 2007 as it made public statements to the contrary in subsequent months.

### B. *Press Releases and 10–K Filing*

During the Class Period, Smith & Wesson issued press releases on June 14, 2007 and September 6, 2007, and filed a 10–K report with the SEC on July 16, 2007.

In the June press release and press conference, and the July 10–K report, the company included the following statements, which Plaintiffs contend were fraudulent:

- "We are raising our sales expectations for fiscal 2008 from $320 million to $330 million, which would represent a 40.5% increase over fiscal 2007 sales."[2]

- "Net income for fiscal 2008 is anticipated to be ... $0.62 per diluted share, double the earnings per diluted share for fiscal 2007.... This increase is expected to result from higher expected sales volume, improvement in gross margins percentage to between 35% and 36%...."

- "Planned capital expenditures for fiscal 2008 of $17.7 million represent a $1.7 million increase ... and allows for an expansion of our polymer pistol manufacturing capacity due to increased demand."

- "The sporting goods channel [sic] you should assume that we will grow our business in the sporting goods channel at a double-digit rate, in about the mid-teens."

- "We are continuing our efforts to enhance our manufacturing productivity in terms of daily production quantities ... increased efficiency, and increased product quality."

- "So as we look in the business, we ended the year with a pretty good backlog. Demand has been strong, and that's-the Thompson, our capacity in Thompson [sic]...."

- "Operational improvements in all our factories throughout fiscal 2007 drove gross margins to an unprecedented level and gave us increased manufacturing capabilities on many fronts. We made substantial investments in our pistol manufacturing capacity, as the growth and demand exceeded 59%."

- "The significant growth of our business, however, requires us to continue to increase our manufacturing capacity. For example, during the last two fiscal years, we have been unable to satisfy on a timely basis the consumer demand for a number of our most popular new products...."

Compl. at ¶¶ 104–121

In the September release and conference call, Smith & Wesson included the following statements, which Plaintiffs contend were fraudulent:

- "We continue to expect revenue to increase to approximately $330 million in fiscal 2008, which would represent a 40% increase over fiscal 2007 revenue."

- "We are increasing our expectations for fiscal 2008 net income to ... $0.63 per diluted share, which is higher than our earlier expectation of ... $0.62 per share."

- "Our results for the first quarter of fiscal 2008 demonstrate progress across many initiatives and reflect growth in our core handgun business as well as our newly established long gun business. Our sales growth was particularly strong.... Handgun sales into the retail channel increased by 41% for the quarter, driven by our direct sales force and a number of ongoing retail initiatives."

---

**2.** Smith & Wesson's fiscal year 2008 comprised May 1, 2007–April 30, 2008.

- "Our results for the first quarter are a great way to start the new fiscal year. To recap, we continued to deliver double-digit growth in year-over-year quarterly revenue, supported by strong sales into the retail channel.... And we are raising our expectations for the full year net income."
- "I want to point out that our sales growth was particularly strong during the first quarter, given that it compares to some major events that occurred in the comparable quarter in the prior year."
- "Major capital expenditures will focus on increasing pistol production capacity to meet increased demand, primarily our pistol product line...."

*Id.*

With the press releases Smith & Wesson included a "Safe Harbor Statement," Dkt. No. 55–2, Dft's Ex. A at 14, that reads, in relevant part:

- Certain statements contained in this press release may be deemed to be forward-looking statements under federal securities laws, and the Company intends that such forward-looking statements be subject to the safe-harbor created thereby. Such forward-looking statements include statements regarding the Company's anticipated sales, income, income per share, cash flows, sales margins, gross margins, expenses ... for the fiscal year ending April 30, 2008; the Company's strategies; the demand for the Company's products; ... the success of any new products.... The Company cautions that these statements are qualified by important factors that could cause actual results to differ materially from those reflected by such forward-looking statements. Such factors include the demand for the Company's products, the Company's growth opportunities, ... the ability of the Company to increase its production capacity, ... and other risks detailed from time to time in the Company's reports filed with the SEC, including its Form–10K Report for the fiscal ear ended April 30, 2006.

The June 14, 2007 conference call began with a similar introduction, Dkt. No. 55–4, Dft's Ex. C at 12, which reads, in relevant part:

- "Our use of words like project, estimate, forecast and other similar expressions is intended to identify those forward-looking statements. Any forward-looking statements that we might make represent our current judgment on what the future holds. As such, such statements are subject to a variety of risks and uncertainties. Important risk factors and other considerations that could cause our actual results to be materially different are described in our securities filings including our Forms F–3, 10–K, and 10–Q. I encourage you to review those documents."

Finally, in the July 2007 10–K filing, the company included the following warnings:

- "The statements contained in this report on Form 10–K that are not purely historical are forward-looking statements within the meaning of applicable securities laws.... All forward-looking statements included in this report are based on information available to us as of the filing date of this report, and we assume no obligation to update any such forward-looking statements. Our actual results could differ materially from the forward-looking statements. Among the factors that could case actual results to differ materially are the factors discussed under Item 1A, 'Risk

Factors'"; and those risk factors were identified as

- "The volume of customer orders relative to capacity"
- "The success of product introductions"
- "Timing of expenditures in anticipation of future customer orders"
- "Pricing and other competitive pressures"
- "Changes or anticipated changes in economic conditions"
- "Accordingly, you should not rely on the results of any period as an indicator of future performance. If our operating results fall below expectations of securities analysts or investors, our stock price may decline."

Dkt. No. 55–6, Dft's Ex. E.

### C. *Internal Sales Monitoring Processes*

Plaintiffs allege that Smith & Wesson maintained at least six different systems and methods for ascertaining consumer demand for its products. Dkt. No. 60, Pltf's Opp. at 6; Compl. at ¶¶ 40–46. They also allege that the individual Defendants had access to this information in its various forms. The systems and methods included:

- Daily meetings between senior sales staff and executives;
- Daily two-page "Orderometer" reports tracking orders and inventory;
- Weekly "Call Reports" that salespeople submitted to senior management describing demand at the dealer and retailer level;
- Monthly reports from distributors reflecting anticipated sales to dealers and retailers;
- Real-time order and inventory software systems;
- Information on "backlog" orders that were to be shipped to customers within six months.

The complaint alleges that the "backlog" information was a significant component of the company's sales projections as one of the Defendant executives stated at the June 14 conference call, "[s]o as we look into the business, we ended the year with a pretty good backlog. Demand has been strong. . . . So we're putting all those together and that's why we reacted confidently with our new guidance." Compl. at ¶ 43. Relying upon statements by former employees and confidential insider sources at Smith & Wesson, the complaint further alleges the executives knew that demand was declining for their products in Winter/Spring 2007.

According to a former Performance Center Marketing Manager, "Orderometer" Reports, collected from Smith & Wesson's real-time order entry system to generate a daily report of sales and production, reflected declining demand for both hand guns and long guns by Spring 2007. Compl. at ¶¶ 60, 89. A former District Sales Representative alleges that the "Call Reports," containing detailed order and inventory information, showed that salespeople were not meeting their sales goals during Winter/Spring 2007. Compl. at ¶¶ 63–67, 94. Regional Sales managers sent e-mails to their sales force in April and May 2007 indicating that management had concluded from state-by-state distributor reports that the company would not achieve its sales goals in Spring 2007. Compl. at ¶¶ 68–70, 96.

A former Sales Administrator for the Law Enforcement Division stated that the firm's real-time order entry and inventory tracking system showed decreasing demand. Compl. at ¶¶ 46–52. Senior managers at the firm used this data to forecast the sales projections included in Smith &

Wesson's fiscal year 2008 operations budget. Compl. at ¶ 97.

Further, the complaint alleges that the executives increased handgun production, leading to high inventory, even though demand waned in Spring 2007. Compl. at ¶¶ 77–85. According to the former Performance Center Marketing Manager, the executives knew from the daily sales and inventory meetings that inventory levels were rising to unacceptably high levels by Spring 2007. Compl. at ¶ 99. Finally, the complaint alleges that the executives visited the Smith & Wesson plant in Springfield and saw stacks of unsold guns. Compl. at ¶¶ 101–102.

### D. Smith & Wesson's Stock Price and Defendant Monheit's Alleged Insider Trading

After the press releases and conference calls in the summer and fall of 2007, Plaintiffs allege that the company's stock price rose, inducing them and other investors to buy stock. The common stock price rose 8% at the beginning of June 2007, the commencement of the Class Period. Compl. at ¶¶ 43, 106–06, 108–09, 112, 115, 119–21. They also allege that during a two-week period after the September 6, 2007 press release, Defendant Monheit sold almost 48% of his holdings of common stock after not having traded a single share in the previous ten months. Compl. at ¶¶ 114, 136–37. Defendants note that these stock sales were done pursuant to S.E.C. Rule 10b5–1 plans that are designed to insulate executives from charges of insider trading.

Smith & Wesson decreased its sales projections on October 29, 2007 and December 6, 2007. Compl. at ¶¶ 123–126. The company's stock price fell by $11.00 per share, or 54%, by December 2007, the end of the Class Period. Compl. at ¶ 12.

### III. DISCUSSION

Confronted with a motion to dismiss, the court must accept all well-pled factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 52 (1st Cir.2008).

In securities cases sounding in fraud, the complaint must meet the pleading standards of both Fed.R.Civ.P. 9(b) and the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2507–08, 168 L.Ed.2d 179 (2007). Plaintiffs must: (1) "specify each statement alleged to have been misleading" and "the reasons why the statement is misleading"; and (2) "with respect to each act or omission . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* Plaintiffs must demonstrate a "plausible entitlement to relief" on their claims. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1967–69, 167 L.Ed.2d 929 (2007). The First Circuit has noted that these pleading requirements are "notably strict and rigorous." *ACA,* 512 F.3d at 58, n. 7 (citation omitted).

The court will address Defendants' three arguments for dismissal beginning with the safe harbor provisions, then continuing with the applicable pleading standards, and finally with the special circumstances of Defendant Monheit.

### A. Statutory Safe Harbor

The PSLRA creates a statutory safe harbor for certain forward-looking statements. 15 U.S.C. § 78u–5. Forward-looking statements include: (1) projections of revenue, income, earnings per share, or other financial items; (2) statements of plans and objectives for future operations; (3) a statement of future economic performance; or (4) any statement of the

assumptions underlying or relating to these types of statements. 15 U.S.C. § 78u–5(i)(1)(A–D).

In pertinent part § 78u–5(c)(1), the safe harbor subsection, provides:

1. In general ... in any private action arising under this title that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, a person ... shall not be liable with respect to any forward-looking statement, whether written or oral if and to the extent that—

(A) The forward looking statement is—

(i) identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important [risk] factors ...; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was-

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

Thus, the safe harbor contains three prongs. A forward-looking statement is protected if it: (1) includes a disclaimer regarding risks and the possibility that results will differ from projections; (2) is immaterial; or (3) the executives of the company had no actual knowledge the

statement was false or misleading. The safe harbor applies both to written and oral statements, such as conference calls and SEC filings. 15 U.S.C. § 78u–5 (c)(2)-(3).

In this case, the second prong does not apply because all the relevant statements were material. Thus, Defendants rely upon the cautionary statements and scienter prongs of the safe harbor.

■ The first prong of the safe harbor immunizes companies and management from liability for forward-looking statements that prove to be false so long as they are accompanied by meaningful cautionary statements. *In re Ibis Tech. Sec. Litig.*, 422 F.Supp.2d 294, 310 (D.Mass. 2006) (quotation omitted). As the First Circuit has noted, this prong creates "a surprising rule that the maker of knowingly false and wilfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for the fraud" if accompanied by meaningful cautionary statements. *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005).

However, when analyzing a forward-looking statement, "the aspect of the statement that is based on present fact must be distinguished from the aspect of the statement that is a future projection. The safe harbor ... is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*, 537 F.3d 35, 45 (1st Cir.2008) (quotations omitted).

This narrow reading of the PSLRA is an essential limitation on scope of a statute that, in the words of one distinguished jurist, "grants (within limits) a license to defraud...." *In re Stone & Webster*, 414 F.3d at 212 (Leval, J.). The subtlety of the statutory framework, and the delicacy of the necessary analysis, requires the

court to distinguish carefully between non-actionable forward-looking statements and potentially actionable statements of present or historical fact.

When investors are "warned of risks of a significance similar to that actually realized, [they are] sufficiently on notice of the danger of the investment to make an intelligent decision about it according to [their] own preferences for risk and reward." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir.1999). A cautionary statement must warn of the alleged misrepresentations sufficiently that "the risk of real deception drops to nil." *Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

To be considered meaningful, cautionary statements must "be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge." *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371–72 (3d Cir.1993); *Rosenbaum Capital LLC v. Boston Comm. Group,* 445 F.Supp.2d 170, 177 (D.Mass.2006) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection.") (citation omitted). The specificity of the cautionary statements is especially critical since the PSLRA provides that "nothing in this section shall impose upon any person a duty to update a forward-looking statement." 15 U.S.C. § 78u–5(d).

Defendants argue that they included meaningful cautionary statements with every press release, conference call, and filing. Plaintiffs respond by arguing that Defendants made assertions regarding then-existing or historical facts and that the cautionary statements included no warnings about those statements.

■ Defendants' forward-looking statements were identified as statements concerning "anticipated sales, income, income per share ... capital expenditures ... for the fiscal year ending April 30, 2008 ... the Company's strategies, the demand for the Company's products...." *See, e.g.,* Dft's Ex. A (June press release); *see also* Dkt. No. 55–8, Dft's Ex. G (Form 10–K); Dkt. No. 55–5, Dft's Ex. D (September conference call). Smith & Wesson repeatedly warned investors that results might vary substantially from these projections. Specifically, it warned about projections regarding "demand" and "growth," which are the gravamen of the complaint.

A careful review of the pertinent cautionary statements reveals that, Plaintiffs' arguments notwithstanding, they fully satisfy the requirements of the PSLRA. The statements are extensive and cover the ground identified by Plaintiffs as relevant. They warn, in clear language, that statements regarding expected projected profits and demand are merely predictions that are subject to risk. In sum, application of the cautionary statements prong of the safe harbor is itself sufficient to render Defendants' forward-looking statements non-actionable.

This does not end the court's inquiry, however. Defendants' forward-looking statements fall within the statutory safe harbor, but any statements of present or historical fact do not. *In re Stone & Webster,* 414 F.3d at 213 ("The safe harbor ... is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement."). Accordingly, the court must determine whether the complaint asserts claims based upon non forward-looking statements and whether Plaintiffs have met the PSLRA's heightened pleading standards.

**B.** *Heightened Pleading Standards Under the PSLRA*

■ To sustain a securities fraud claim under Section 10(b) and Rule 10b–5, Plain-

tiffs must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *ACA*, 512 F.3d at 58. Per *Tellabs*, the PSLRA requires Plaintiffs to: (1) "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading"; and (2) "with respect to each act or omission . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 127 S.Ct. at 2508.

Defendants argue that Plaintiffs have failed to allege sufficient evidence of misrepresentations or omissions of material fact relating to the company's description of "strong" and "increased" historical and present demand for its products. The complaint asserts that statements regarding "demand" were misleading because Defendants knew: (1) that Smith & Wesson was failing to meet its internal sales goals in Winter/Spring 2007; and (2) that the firm's inventory had accumulated to an unprecedented level. *See* Compl. at ¶ 122. Plaintiffs contend that they have pled each of the required elements with particularity, specifying the statements, the misleading parts of each statement, the reasons they were misleading, and the manner in which they were misleading.

i. *Falsity of Defendants' Statements*

■ Defendants first argue that statements about "increasing demand" are "mere optimistic corporate puffery" and "vague." *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12, 26

(D.Mass.2000). Thus, Defendants contend they are not material.

■ This argument is unpersuasive for two reasons. First, to be deemed "puffery," a statement must be "so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information." *Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp.2d 239, 250 (D.Mass.2006). Here, Defendants' statements regarding the strength of past demand and "backlog" orders are definite and important to a potential investor. Second, courts have held that only purely forward-looking statements are entitled to protection as "mere puffery." Statements of present or historical fact are not mere "puffery." [3] *Id.*; *Rosenbaum*, 445 F.Supp.2d at 176.

■ Next, Defendants argue that all of their statements regarding demand, growth, and profits were in fact true. Before the June 2007 statements, Smith & Wesson had experienced 59.2% quarter-by-quarter growth in sales. Dkt. No. 55–13, Dft's Ex. L. For the last completed quarter before the September 2007 press release, the company experienced 56.3% growth. *Id.* For the second and third quarters of fiscal year 2008 (August 1, 2007–January 31, 2008), it experienced between 22.6% and 39.4% growth. Dkt. No. 55–9, Dft's Ex. H at F–48–49. Defendants argue that only in the fourth quarter of fiscal year 2008 (February 1, 2008–April 30, 2008) did demand for Smith & Wesson products drop. They warned investors in October and December 2007 about this possibility. Compl. at ¶¶ 123, 125.

---

**3.** During oral argument, counsel for Defendants argued, in the alternative, that statements regarding demand were assumptions upon which Smith & Wesson rested its forward-looking statements, thus invoking another aspect of the PSLRA's safe harbor. 15 U.S.C. § 78u–5(i)(1)(D). This argument is un-

persuasive because Defendants' did not exclusively project sales and profits "assuming increasing demand." Instead, according to the complaint, they stated, for example that, "sales growth *was* particularly strong" and "demand *has been* strong." Compl. at ¶ 109, 114 (emphasis added).

The information offered by Defendants to rebut Plaintiffs' claims of falsity may be pertinent to an assessment of a future motion for summary judgment, but it cannot support dismissal prior to discovery. The complaint includes numerous particularized allegations regarding the falsity of Defendants' statements regarding present and past demand. Smith & Wesson listed "demand" and "backlog" as two key components forming the basis for its profit projections. Courts have found that causal statements indicating that present facts will increase future profits are actionable if false and misleading. *In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 331–32 (D.Mass.2002) (finding actionable a statement that a product was "fueling growth"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 180 (S.D.N.Y.2003) (finding actionable a statement that a company was "in a very strong position, with solid performance in virtually every business").

In this case, as noted above, Defendants made statements such as "demand has been strong," "growth in demand exceeded 59%," and "our sales growth was particularly strong." Though these allegations may not provide the strongest possible basis for a securities claim, they do allege the falsity of Defendants' statements with sufficient specificity and particularity to make dismissal at this stage improper.

### ii. *Scienter*

Under the PSLRA's heightened pleading standards, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ACA*, 512 F.3d at 58–9. Plaintiffs must establish that Defendants acted with "conscious intent to defraud" or a "high degree of recklessness." *Id.* at 58 (citation omitted).

■ In this context, recklessness means "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care...." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir.1999) (citation omitted). This standard does not require irrefutable proof of scienter, but only enough to support an inference of scienter that is equally as strong as an inference suggesting innocent conduct. *Mississippi Pub. Employees Ret. Sys. v. Boston Scientific*, 523 F.3d 75, 86 (1st Cir.2008); *ACA*, 512 F.3d at 59 ("[w]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.").

Defendants argue that: (1) Plaintiffs are improperly attempting to prove "fraud by hindsight"; and (2) allegations based on the executives' stock compensation plans, statements by confidential informants, and stock sales by non-parties do not show scienter. They contend that a proper analysis of each of these data independently rebuts an inference of scienter.

■ Under the fraud by hindsight doctrine, general allegations "that defendants knew earlier what later turned out badly" are not sufficient to plead scienter. *Ezra Charitable Trust v. Tyco Int'l*, 466 F.3d 1, 6 (1st Cir.2006). The complaint adequately alleges that Defendants knew the demand projections were inflated in Winter/Spring 2007, meaning they had no justification for projecting high revenue growth. Compl. at ¶¶ 122, 128–32. Whether the record will be strong enough to support these allegations after discovery, and in the face of a motion for summary judgment is an open question, but on the face of the complaint, Plaintiffs do not merely argue that the results did not match projections independent of Defendants' knowledge in Winter/Spring 2007.

■ As will be seen, the court's analysis of the complaint reveals sufficient allega-

tions of scienter. One allegation deserves special comment by the court due to its significance to the parties, though it does not independently give rise to an inference of scienter at this stage of the litigation. Plaintiffs contend that management's year-end bonuses and stock-based compensation provided them incentives to boost artificially the company's stock price. Plaintiffs must couple these allegations, however, with "some additional misconduct" that gives rise to an inference of scienter such as "[the] disclosure of inconsistent information shortly after the making of a fraudulent statement ... bribery by top company officials ... [or] accounting shenanigans." *Baron v. Smith*, 285 F.Supp.2d 96, 108 (D.Mass.2003). That the executives may have gained some compensation is not enough, since stock-based compensation is a common feature of pay packages and executives already have an incentive to provide value to their shareholders. *In re Cabletron Sys., Inc.,* 311 F.3d 11, 39 (1st Cir.2002). In the absence, at this stage, of any allegation of "additional misconduct," these compensation-based arguments cannot support an inference of scienter.[4]

Defendants challenge evidence gleaned from informants, sales data, and other sources. First, they argue that none of the informants possessed a full picture of product demand. This argument is unavailing because the complaint does not allege that any individual informant provided "smoking gun" evidence regarding scienter. Instead, Plaintiffs base their allegations on interviews with twelve former employees, engineers, and heads of distributors. Pltf's Opp. at 17. Each provides

bits and pieces of the larger mosaic of allegations Plaintiffs present. The complaint indicates that each of these individuals had interactions with the executives at sales meetings and other situations where, they allege, it was clear that the executives knew demand was decreasing in Winter/Spring 2007. *Boston Scientific* does not require absolute proof of scienter to survive a motion to dismiss but merely enough to raise an inference equal to that of innocent conduct. *ACA,* 512 F.3d at 59. Plaintiffs have met that burden.

Finally, Defendants contend that their internal reporting mechanisms produced data that did not correlate with actual sales or future sales and that Plaintiffs' reliance on them was therefore misplaced. These systems reflected internal sales goals that Smith & Wesson sought to meet but was not legally required to disclose or meet. Dkt. No. 65, Dft's Reply at 9. Defendants repeat and expand upon this basic claim for each type of reporting data. *Id.* at 9–17. These arguments are unpersuasive because the complaint adequately alleges that Smith & Wesson made a series of statements about present or historical fact, including that "demand has been strong" and "growth in demand has exceeded 59%." That these reports do not correlate with future growth is irrelevant because the complaint, at least, adequately alleges that Defendants knew such statements were false and materially misleading at the time they were made.

In summary, even disregarding any argument based on compensation or bonuses, the allegations in the complaint would be

---

4. Defendants argue that they revealed the lower growth projections at the end of fiscal year 2008 at the very time when bonuses would be determined. Thus, they had no incentive to inflate the price of the stock before that period. This argument may have

merit at summary judgment, but need not be addressed here since the court is not relying on any allegation regarding bonuses or compensation to find that the complaint adequately pleads scienter.

sufficient, if proved, to demonstrate scienter.

Though Defendants may claim the benefit of the statutory safe harbor for forward-looking statements, they may not for statements of present or historical fact. The complaint adequately alleges both falsity and scienter with respect to these statements. As already noted, a very large number, probably the majority, of the statements Plaintiffs cite in the complaint in support of their claims are forward-looking and not actionable. Enough statements, however, constitute statements of present or historical fact to stave off entry of judgment at this stage.

### C. Defendant Monheit's Alleged Insider Trading

 In addition to the claims discussed above, which apply to all Defendants, Plaintiffs have brought a claim under Section 20(a) of the Securities Exchange Act of 1934 against Defendants Golden, Kelly, and Monheit. 15 U.S.C. § 78t(a).

Under Section 20(a), Plaintiff must allege: (1) an underlying violation of securities laws by a controlled person or entity (in this case, Smith & Wesson); and (2) control by an individual Defendant of the violator. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84–85 (1st Cir.2002). In the absence of an underlying violation of Section 10(b) or Rule 10b–5, the Section 20(a) claim must be dismissed.

It is undisputed that Defendants Golden and Kelly were in controlling positions at Smith & Wesson and were the individuals who made the relevant public statements in June and September 2007. Since Plaintiffs' Section 10(b) and Rule 10b–5 claims survive against Smith & Wesson for misstatements of present or historical fact, the Section 20(a) claim against these individuals survives as well.

However, Defendant Monheit was an independent board member, not an officer of the firm. There are no allegations that he availed himself of internal reports, attended any of the sales meetings, or took other steps to learn about the alleged decline in demand. Though he signed Smith & Wesson's 2007 10–K filing, this document contains insufficient representations to constitute actionable misstatements. At best, it indicated that handgun production had increased from 2004–2007 and that the concomitant, "significant growth of our business, however, requires us to increase our manufacturing capacity. For example, during the last two fiscal years, we have been unable to satisfy ... the consumer demand [for a number of products]." Compl. at ¶ 113. Plaintiffs offer merely a generalized allegation as to Monheit's control over the company and its statements to investors.

Monheit's stock sales in the two weeks after the September 2007 press release and conference call were made pursuant to Rule 10b5–1 plans, which existed to ensure that insiders were not charged with trading "on the basis of ... adverse material non-public information." *Stiegele v. Bailey*, 2007 WL 4197496, at *13 (D.Mass. Aug. 23, 2007) (citation omitted). The existence of such a plan generally "rebuts an inference of scienter and supports the reasonable inference that stock sales were pre-scheduled and not suspicious." *Id.* (citations omitted).

In sum, the complaint has not alleged facts sufficient to sustain a claim against Defendant Monheit.

### IV. CONCLUSION

The complaint contains allegations regarding both forward-looking and non forward-looking statements. The statutory safe harbor provisions of the PSLRA immunize Defendants from liability for for-

ward-looking statements because they included meaningful cautionary statements. However, Defendants' statements of present or historical fact are actionable because the complaint adequately alleges both their falsity and Defendants' knowledge of their falsity. Accordingly, Plaintiffs' allegations are enough to sustain claims against Smith & Wesson and two of the individual Defendants. As to Defendant Monheit, no allegations adequately suggest that he knew of the falsity of Defendants' statements. Moreover, his sales of stock did not give rise to an inference of scienter because they were made pursuant to statutorily protected plans.

It is worth noting that this ruling may be a mixed success for Plaintiffs. While the complaint survives dismissal, the PSLRA permits a narrower universe of actionable statements than Plaintiffs envisioned. The court will look carefully at the sufficiency of the record at the summary judgment stage. Discovery in this case will almost certainly prove costly. Counsel may be well advised to pursue scrupulously any possibility of an agreed-upon resolution of the case.

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 53), is hereby ALLOWED as to Defendant Barry Monheit and DENIED as to all other Defendants. This case is hereby referred to Magistrate Judge Kenneth P. Neiman for a scheduling conference pursuant to Fed. R.Civ.P. 16.

It is So Ordered.