# United States Court of Appeals
## For the First Circuit

No. 11-1436

IN RE: SMITH & WESSON HOLDING CORP. SEC. LITIG.

OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM,

Plaintiff, Appellant,

v.

SMITH & WESSON HOLDING CORP.;
MICHAEL GOLDEN; JOHN A. KELLY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before
Boudin and Lipez, Circuit Judges,
and Smith,[*] District Judge.

Bryan A. Wood with whom Glen DeValerio, Norman Berman, John H.
Sutter and Berman DeValerio were on brief for appellant.
John A. Sten with whom Jason C. Moreau and Greenberg Traurig,
LLP were on brief for appellees.

February 17, 2012

[*]Of the District of Rhode Island, sitting by designation.

**BOUDIN**, **Circuit Judge**.    A class of plaintiffs representing purchasers of Smith & Wesson Holding Corporation securities sued the company ("Smith & Wesson") and two of its high-ranking officers, Michael Golden and John A. Kelly, alleging that the company issued false or misleading public statements about the demand for its products in violation of the Securities Exchange Act of 1934 and related regulations.[1]    The district court granted summary judgment to Smith & Wesson, and the plaintiffs now appeal.

Smith & Wesson is the parent company of the well-known gun manufacturer; Golden was the President and Chief Executive Officer of Smith & Wesson during the period in question, and Kelly was the Chief Financial Officer.    The lead plaintiff, Oklahoma Firefighters Pension and Retirement System, represents a class of all persons purportedly suffering damages as a result of the purchase of Smith & Wesson common stock on the open market between June 14, 2007, and December 6, 2007.    It is common ground that the stock suffered precipitous declines starting with the company's release in late October 2007 of unfavorable preliminary second-quarter earnings data and downwardly revised earnings projections.

---

[1]Count I charged the corporation and individual defendants with violations of Section 10(b) of the Act, 15 U.S.C. § 78j(b) (2006), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (2011), while Count II alleged violations by the individual defendants of Section 20(a) of the Act, 15 U.S.C. § 78t(a).    The latter claim is derivative, ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 67-68 (1st Cir. 2008), and needs no separate discussion.

By contrast, for the two quarters prior to the decline, the company had provided investors with impressive sales numbers and optimistic future earnings projections. In plaintiffs' view, ballooning inventory and various internal reports indicated flagging business by the summer of 2007 and prompted the company to inflate artificially the sales numbers through unusual promotions and discounting that stripped revenues from future quarters. The chronology of press releases and public statements is as follows.

The first relevant announcement, issued on June 14, 2007, and titled "Smith & Wesson Holding Corporation Posts Record Annual Revenues and Earnings," reported strong performance in the final quarter of the company's fiscal year 2007 and the fiscal year overall--periods not coinciding with ordinary calendar quarters.[2] In addition to providing historical performance data, the company made several statements about its expectations for fiscal year 2008; in particular, it announced that it was "raising [its] sales expectations for fiscal 2008 from $320 million to $330 million, which would represent a 40.5% increase over fiscal 2007 sales"; it also upwardly revised earnings guidance from $0.60 per share to $0.62 per share, which the company pointed out was double the earnings guidance from the previous fiscal year.

_____

[2]Smith & Wesson's fiscal year runs from May 1 through April 30, so fiscal year 2007 covered the period May 1, 2006, through April 30, 2007. Accordingly, the final quarter of fiscal 2007 encompassed February-April 2007; the first quarter fiscal 2008, May-July 2007; and the second, August-October 2007.

The projections were accompanied by a clearly labeled "Safe Harbor Statement" warning that the press release contained "forward-looking statements," including statements regarding future sales, income, income per share, earnings, penetration rates for new and existing markets, strategies, and the demand for the company's products, and that those statements were "qualified by important factors [identified in the statements] that could cause actual results to differ materially from those reflected by such forward-looking statements."[3]

Golden and Kelly participated in an investor conference call later that day, which began with a similar announcement that all forward-looking statements made during the call were necessarily subject to uncertainty. In response to a question about why the company raised its guidance, Kelly stated:

> So as we look in the business, we ended the year with pretty good backlog. Demand has been strong, and that's--the Thompson, our capacity in Thompson, we've gotten our barrel output up by 20% in the first whatever it's been, five months, that we've had it. So we're putting all those together, and that's why we reacted confidently with our new guidance.

Kelly also noted that "[p]lanned capital expenditures for fiscal 2008 of $17.7 million represents [sic] a $1.7 million increase from

---

[3]The "safe harbor" provisions of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-5, sharply limit liability of companies and their management for certain "forward-looking statements," defined in the statute, when such statements are accompanied by appropriate cautionary language.

our previous estimate and allows for an expansion of our polymer pistol manufacturing capacity due to increased demand."  The company's stock price rose 8 percent the next trading day.

On September 6, 2007, following the close of the first quarter of fiscal 2008 (May-July 2007), Smith & Wesson issued a press release reporting record earnings for the quarter: "Smith & Wesson Holding Corporation Posts Record First Quarter Revenues and Profits."  It quoted Golden as offering the following explanation:

> Our results for the first quarter of fiscal 2008 demonstrate progress across many initiatives and reflect growth in our core handgun business as well as our newly established long gun business.  Our sales growth was particularly strong given that the comparable quarter of the prior year included $5.2 million in U.S. government orders for Afghanistan that were not duplicated in the current quarter.  Handgun sales into the retail channel increased by 41.0% for the quarter, driven by our direct sales force and a number of ongoing retail initiatives.

The company once again increased its fiscal 2008 earnings expectations, this time from the $0.62 per share amount announced in June to $0.63 per share.  The release also stated that "[w]e expect second quarter revenue to increase by approximately 60% over revenue in second quarter of fiscal 2007, driven by continued expansion in our existing markets and the addition of revenue from Thompson/Center [acquired in January 2007]."  The September press release, and the conference call that followed, contained "safe

harbor" statements similar to those contained in the June 2007 communications.

In the conference call held later on the day of the release, Golden and Kelly made several statements characterizing the first-quarter results and offering some explanation for the upward revision to earnings guidance:

> Th[e] increase in our annual earnings projection from our previously announced guidance reflects the stronger than anticipated first quarter performance.
>
> [W]e continue to deliver double digit growth in year-over-year quarterly revenue, supported by strong sales into the retail channel and our ongoing penetration in law enforcement.
>
> The results we delivered this quarter in the retail channel reflect growth in our core handgun business as well as the addition of and growth in our newly established long gun business.
>
> I want to point out that our sales growth was particularly strong during the first quarter given that it compares to some major events that occurred in the comparable quarter in the prior year.

The company's stock price rose about 5 percent the next trading day.

However, on October 29, 2007, the company revealed disappointing preliminary financial results for the second quarter (August-October 2007), which it attributed to

> a combination of factors that emerged late in the quarter. Among these factors were softness in the market for hunting rifles and shotguns, driven by lower than expected

-6-

consumer demand, a buildup of pre-season
retail inventories, and unseasonably warm
autumn weather, which decreased retail traffic
and compressed the fall hunting season.

The company also revised down its earnings guidance from $0.63 per share to $0.53 per share. Smith & Wesson's stock price dropped 40 percent the next trading day.

On December, 6, 2007, the company released its final second-quarter results, and further revised down its earnings guidance from $0.53 per share to $0.40 per share, citing the same factors listed in its October 29 press release as well as an "industry-wide inventory buildup, accentuated by lower retail traffic, caus[ing] order activity to slow beginning in October." The stock price fell another 29 percent the next day.

Three different lawsuits, later consolidated, were filed against Smith & Wesson, Golden, Kelly and a third officer who was later dismissed. In a thorough and thoughtful decision, the district court denied Smith & Wesson's motion to dismiss, In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332 (D. Mass. 2009), which relied primarily on the "safe harbor" provisions of the PSLRA; but the district court made clear that those provisions narrowed the plaintiffs' case and that they had gotten only a ticket to discovery.

The district court agreed that the plaintiffs' complaint "contain[ed] allegations based mainly on forward-looking statements" that qualified for protection under the PSLRA; but

"distinguish[ing] carefully between non-actionable forward looking statements and potentially actionable statements of present or historical fact," In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d at 334, the court found "sufficient, albeit thin, allegations of Defendants' intentionally false statements of present or historical fact." Id. at 335.

The court granted class certification and the case proceeded to discovery, after which Smith & Wesson sought summary judgment and the plaintiffs sought partial summary judgment on one issue. Thereafter the court granted summary judgment for Smith & Wesson, finding a lack of misrepresentation and of scienter, without reaching two other issues raised by Smith & Wesson (loss causation and "controlling person" liability). In re Smith & Wesson Holding Corp. Sec. Litig., No. 07-30238-MAP, 2011 WL 6089727 (D. Mass. Mar. 25, 2011). The plaintiffs have now appealed to this court.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); we review grants of summary judgment de novo, considering the facts in the light most favorable to the nonmoving party. Bos. & Me. Corp. v. Mass. Bay Transp. Auth., 587 F.3d 89, 98 (1st Cir. 2009). In this case, the factual disagreements are largely about the inferences to be drawn from the record.

Claims under Section 10(b) and Rule 10b-5 have six elements: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Miss. Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp., 649 F.3d 5, 20 (1st Cir. 2011). Only the first two elements are at issue in this appeal and, as to both, plaintiffs rely heavily on three kinds of evidence to show that Smith & Wesson knew demand was weakening when it reported strong sales numbers in June and September.

First, Smith & Wesson generated monthly inventory reports that were distributed, along with other financial reports, in a "red book" reviewed by senior management during monthly executive meetings. Although inventory generally built up in the first quarter to satisfy increased demand later in the fiscal year, plaintiffs say that the excess inventory was usually sold off by August, yet in August 2007 inventory "exploded" to $12.8 million in goods (compared to $3.9 million the previous year) and continued to trend upward.

Second, plaintiffs point to a host of internal tracking data indicating that demand was flagging:

> "Orderometer" reports containing up-to-date information about the company's progress toward meeting revenue goals, reviewed each day by senior management, showed the company consistently falling short of sales targets, including (by plaintiffs' calculations) a 54

percent total shortfall in August and even higher misses in subcategories described as strong in the company's press releases, such as M&P (69 percent miss) and Sigma (80 percent miss) model pistols.

"Call Reports," in which sales managers described interactions with customers at both the distributor and dealer levels, showed during the first quarter of fiscal 2008 evidence of demand decreases due to bloated customer inventories with statements like: "[distributors are] Extremely Stuffed with product" (July 6, 2007), and "[distributors are] reporting inventory buildup at levels never seen by them at this time" (July 11, 2007). Indeed, the plaintiffs note (and Smith & Wesson does not dispute) that four out of Smith & Wesson's six largest distributors declined or substantially reduced orders in July, all citing bulging inventories.

"End of Month Backlog" reports-- "backlog" referring to orders expected to ship in the following six months--similarly showed declining year-over-year performance in each month of the first quarter, culminating in a July backlog that was down 29 percent from the previous year.

Third, plaintiffs point to various promotions and discounts that Smith & Wesson used allegedly to pull revenues from future quarters to compensate for declining sales. Plaintiffs point to two sets of promotions; the first consisted of three so-called "pull forward" promotions in the fourth quarter of fiscal 2007; the second set of promotions occurred in July 2007, allegedly pulling future revenues into the first quarter of fiscal 2008 (May-July 2007).

-10-

To show that senior management was aware of serious sales problems before the company issued the September 2007 statements, plaintiffs point to a pair of August 20, 2007, e-mails from Kelly: "it seems like we are digging a deep hole to start the quarter," and "it looks like we will have net sales of about $16 million for the month and miss the profit target by at least three to four cents . . . We may not even be ahead of last year. Ouch." Also, notes from an August 29, 2007, business review meeting attended by Golden and Kelly recorded: "Market is booming. July is first month in 32 months we were down year-over-year, August is second month in 33 months. Industry is growing by 15-17% and we're shrinking."[4]

Smith & Wesson's oft-repeated response to the plaintiffs' evidence is that the June and September statements reported accurate figures; but "the fact that a statement is literally accurate does not preclude liability under federal securities laws." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994). For Rule 10b-5 creates liability (assuming scienter, causation and other elements of the offense) not only where a material misstatement occurs, but also where a material omission exists. 17 C.F.R. § 240.10b-5(b).

---

[4]The company's former Operations Controller, Thomas Coghill, said of the July and August sales that "[w]e were building [guns] to plan, and the sales didn't materialize to reduce our inventory levels"; Coghill also stated that Kelly and Vice President of Finance John Dineen were aware of the troublesome inventory numbers in July 2007.

"[M]ere possession of material, nonpublic information does not create a duty to disclose it," Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011) (internal punctuation omitted), but "when a company speaks, it cannot omit any facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" Id. (quoting 17 C.F.R. § 240.10b-5). Materiality means a substantial likelihood exists that a reasonable investor would have viewed the fact as significantly altering the total mix of information made available. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 756 (1st Cir. 2011).

The gist of the plaintiffs' case is this: (1) that the company's June and September 2007 press releases and accompanying statements indicated or implied that strong existing demand supported the reported sales numbers; (2) that the strong sales numbers resulted in part from discounts used to pull orders from future quarters; and (3) that in any event at least by July signs of declining demand were apparent and so should have been disclosed in the early September statements.

In our view, the strong sales numbers, however accurate, and the company's cheerleading commentary (described and quoted above) did carry with them (or at least a jury could so find) an implied message that they reflected strong demand, as of the time the sales were made. Purely forward looking statements that

accompanied the sales numbers do enjoy considerable protection, see note 3 above; but the implication was that the sales numbers represented market demand at the time of the sales, which concerned past factual conditions--not predictions.

Further, as to the September statements, because the past sales and upbeat commentary were reported a month or more after the quarter reported on had ended, a culpable omission could exist if management knew that conditions had deteriorated significantly after the quarter had ended. To the extent that such an omission was misleading, it would be made so by facts already known to have occurred in July and August and not by errors in a mere forecast as to expectations for the second quarter.

Admittedly, with a possible ambiguous exception in the June statements,[5] the statements did not purport to be describing overall demand--and this may be of some comfort to defendants. But the September statements, which alone turn out to matter, could still be taken to imply that overall demand in the first quarter was strong; for example: "[o]ur sales growth was particularly strong" and "we continue to deliver double digit growth in year-

---

[5]One of the June 2007 references could be read, as the district court did, as referring only to one line of business, but it is arguably ambiguous; the other explicit mention of demand in the June statements referred only to a specific line of products. Plaintiffs also claim that nothing could reasonably be said about demand based merely on sales figures--that inherently such statements imply elaborate statistical studies--but this is not evident to us.

over-year quarterly revenue, supported by strong sales into the retail channel and our ongoing penetration in law enforcement."

Turning then to the evidence, we start with the June statements. While the plaintiffs suggest that some signs of a looming problem emerged prior to the June statements, that evidence is razor thin and often limited to a single product line--for example, Orderometer reports showing missed internal handgun sales targets in five of the seven months before June and a few references to soft markets in other products.

But the Orderometer reports plaintiffs cite were, at best, mixed, as were the Call Reports, and their significance was therefore limited. Three of the five so-called failures to meet handgun targets were misses of less than 5 percent, and the plaintiffs also omit mention of some exceptionally strong results-- for example, April sales exceeding targets by 46 percent--during the same period. Further, internal targets may be designed as incentives as much as predictions. In re Smith & Wesson Holding Corp. Sec. Litig., 2011 WL 6089727, at *8.

And, Smith & Wesson enjoyed substantial sales growth leading up to the June statements: using the most conservative growth figures cited to us, 39 percent growth in Q3 over the comparable quarter the previous year, 22 percent growth in Q4, and 34 percent growth in the fiscal year overall. Minor failures to meet aggressive internal sales growth targets do not show crumbling

demand--especially when the sales themselves show growth.  Cf. In re Symbol Techs. Class Action Litig., 950 F. Supp. 1237, 1243-44 (E.D.N.Y. 1997).

Plaintiffs assert that the company's April promotions accelerated revenues slated for Q1 2008 into Q4 2007 and amounted to "channel stuffing," that is, "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company," thus "shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999).

But offering discounts to stimulate sales is not automatically manipulation and may well stimulate demand. Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 709 (7th Cir. 2008). Anyway, here the plaintiffs' case as to June rests on only three pull-in deals plus rhetoric; nothing shows that the pull-ins were unusual, represented a significant percentage of the reported sales for the quarter, or were otherwise suspect. In re Smith & Wesson Holding Corp. Sec. Litig., 2011 WL 6089727, at *9.

That brings us to the company's September statements, and we begin with the July discounts.  Here, both manipulation and causation are open to question.  As Judge Posner explained in Makor,

> [a] certain amount of channel stuffing could
> be innocent and might not even mislead--a

> seller might have a realistic hope that
> stuffing the channel of distribution would
> incite his distributors to more vigorous
> efforts to sell the stuff lest it pile up in
> inventory.

513 F.3d at 709. In sum, such practices are neither inherently fraudulent nor always innocent; size, design, purpose, transparency, and history are all relevant. See In re Cableton Sys., Inc., 311 F.3d 11, 34-35 (1st Cir. 2002); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 81 (1st Cir. 2002); In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1407 (9th Cir. 1996), cert. denied, 520 U.S. 1103 (1997).

Plaintiffs say that about $7 million of Smith & Wesson's first-quarter 2008 revenues--one-third of its July sales and about 10 percent of the company's quarterly revenue--were the result of discounting, but plaintiffs do not dispute that discounting is common in the firearms industry nor do they offer comparable figures from prior years. And the July quarter, as the company had disclosed in a 10-K statement, was traditionally the weakest, so greater efforts to stimulate July sales would not be surprising.

Further, the fall-off in demand in the second half of 2007 turns out to have lasted long after the July discounts and in some degree to have affected the industry and not just Smith & Wesson, so--notwithstanding one anecdotal opinion[6]--it is uncertain

_____

[6]Plaintiffs' point to an August 5, 2007, Call Report from one of the company's National Accounts Managers, David McDaniel, who noted under the heading "Key distributor activity and issues" that

-16-

how far the July promotions explain the August fall-off of sales for the defendant.  In all events, plaintiffs--who had access to discovery--are surprisingly light in quantitative evidence that the discounts exceeded what was traditional for the slack period.  That the July offers targeted individual customers who were proving difficult to lure is hardly surprising or ominous.

The failure to disclose the documented fall in sales in August is a different matter.  That sales did fall substantially is reasonably clear--August net sales decreased about one-third from the previous year (from $12,184,000 to $8,595,000) and gross profits fell by more than 50 percent (from $2,736,000 to $1,240,000).  These are troubling figures even though the August 29 meeting notes also contained positive assessments[7] and the hard numbers are only for the first month of a quarter when sporting and hunting sales usually picked up considerably.

Still, even if we assume arguendo that bad present numbers should trump optimism and ought to have been disclosed or even that more should have been said about discounting, the present

"[w]e have pulled a tremendous number of sales from August and September into July trying to make the numbers.  We'll have to watch this closely as it might be an issue to deal with for August and September."

[7]"Walther is over plan"; "Consumer is above plan"; "Revolvers over [plan]"; "Order flow is strong now"; "Feedback [from distributors] so far is spotty, some guys up, some guys flat"; "[W]e have inventory to support additional orders, and we have programs to drive those sales."

suit fails for lack of proof of scienter.  Section 10(b) is primarily a fraud provision and "a showing of either conscious intent to defraud or a high degree of recklessness" is required. Miss. Pub. Emps.' Ret. Sys., 649 F.3d  at 20 (internal quotation marks omitted).  Recklessness in this context is

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

Miss. Pub. Emps.' Ret. Sys., 649 F.3d at 20.

Scienter is inherently a fact-intensive inquiry, Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008), and courts are normally cautious about granting summary judgment for the defense on this issue.[8]  But this hesitancy assumes that there is either some evidence of subjective bad intent, or, alternatively, misstatements or omissions so blatantly improper that bad intent or recklessness can be inferred, e.g., Malone v. Microdyne Corp., 26 F.3d 471, 478-79 (4th Cir. 1994).  There is no evidence of the former in this case and, at best, a thin and debatable case as to misstatements or omissions.

----

[8]E.g., Miss. Pub. Emps.' Ret. Sys., 649 F.3d at 20; Provenz v. Miller, 102 F.3d 1478, 1489-90 (9th Cir. 1996), cert. denied, 522 U.S. 808 (1997); P.H. Glatfelter Co. v. Voith, Inc., 784 F.2d 770, 774 (7th Cir. 1986); cf. In re Chavin, 150 F.3d 726, 727-28 (7th Cir. 1998).

As City of Dearborn said, "[i]f it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." 632 F.3d at 757. The July promotions have not been clearly shown to be abnormal; and failure to disclose in early September the decline evidenced from the August figures may have been a negligent misjudgement; but, without more, an inference of culpable recklessness is a bridge too far.

Once the downward trend became clear with the second-quarter numbers, the company explicitly acknowledged that its forecasts had been undermined; as described at the outset, it offered preliminary negative figures in late October well before the final numbers were in hand, attributing the decline to "a combination of factors that emerged late in the quarter." Whether or not it was negligent to have remained too sanguine in early September, there is no evidence of anything close to fraud.

Affirmed.