**In re SMITH & WESSON HOLDING CORP. SEC. LITIG.**

C.A. Nos. 07–30238–MAP, 08–10028–MAP, 08–30001–MAP.

United States District Court, D. Massachusetts.

March 25, 2011.

*MEMORANDUM AND ORDER RE-GARDING DEFENDANTS' MO-TION FOR SUMMARY JUDG-MENT, PLAINTIFFS' MOTION TO STRIKE EXPERT TESTIMONY, PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY JUDG-MENT, AND DEFENDANTS' MO-TION TO STRIKE EXPERT TESTI-MONY* (Dkt. Nos. 171, 185, 189, & 198)

PONSOR, District Judge.

## I. INTRODUCTION

In this securities class action, Plaintiffs allege that Defendant Smith & Wesson

Holding Corp. ("Smith & Wesson" or "the Company") and three individual Defendants issued a series of public statements in which they misrepresented the level of demand for Smith & Wesson products. Based on this, Plaintiffs have filed a two-count complaint. Count I charges the corporation and the individual Defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Count II offers claims against the individual Defendants under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

Presently before the court are Defendants' Motion for Summary Judgment on both counts (Dkt. No. 171) and Plaintiffs' Cross Motion for Partial Summary Judgment solely on the issue of scienter (Dkt. No. 189). The parties have also moved to strike the testimony of opposing expert witnesses. (Dkt. Nos. 185 and 198.) For the reasons discussed below, Defendants' Motion for Summary Judgment will be allowed in its entirety, and Plaintiffs' Cross Motion for Partial Summary Judgment will be denied. The motions to strike will be denied as moot.

The court's decision ultimately rests on its conclusion that no reasonable jury could find (a) that Defendants' statements regarding the level of demand for Smith & Wesson products were false or misleading or (b) that Defendants acted with scienter. The analysis leading to this conclusion will require the court to unpack the concept of "demand." As will be seen, Defendants' statements describing significantly increased levels of demand, identified by Plaintiffs as false, were in fact true; the fact that other mixed and ambiguous evidence existed that might (or might not)

simultaneously have signaled an imminent drop in demand did not, as a matter of law, render Defendants' true statements false or misleading. The conclusion is unavoidable that—despite vigorous and resourceful efforts by Plaintiffs' counsel—the evidence of record, viewed in the light most favorable to Plaintiffs, cannot sustain the causes of action offered in the class action complaint against any of the Defendants. The court will therefore order entry of judgment in Defendants' favor in all three cases joined for purposes of this class action.[1]

## II. *FACTUAL BACKGROUND*

Defendant Smith & Wesson Holding Corporation describes itself as the "parent company of Smith & Wesson Corp., the legendary 155–year old company in the global business of safety, security, protection and sport." (Dkt No. 47, Am. Compl. ¶ 105.) The Company manufactures and sells firearms and firearms-related products throughout the world.

Smith & Wesson's fiscal year 2007 ended on April 30, 2007. Six weeks later, on June 14, the Company issued a press release entitled "Smith & Wesson Holding Corporation Posts Record Annual Revenues and Earnings," in which the Company announced it was "raising our sales expectations for fiscal 2008 from $320 million to $330 million, which would represent a 40.5% increase over fiscal 2007 sales." (*Id.*) Smith & Wesson also increased earnings guidance to $0.62 per share, twice its earnings guidance from the previous fiscal year, which the Company attributed to "higher than expected sales volume, improvement in gross margin percentage to between 35% and 36%, a decline in operating expenses as a percentage of sales and

---

1. The absence of evidence of falsity in the statements, or of any actionable scienter, makes it superfluous to address Defendants'

alternate, and powerful, argument that the record also lacks evidence demonstrating loss causation.

licensing, and a full fiscal year of impact from [a recently acquired manufacturing facility]." (*Id.*)

Defendant Michael Golden, the Company's Chief Executive Officer, and Defendant John Kelly, the Company's Chief Financial Officer, participated in an investor conference call the same day, in which they expanded on their optimistic projections. Among other things, Defendant Kelly reiterated during this call that "demand has been strong." (*Id.* ¶ 109.) Smith & Wesson's stock price rose eight percent the following day.

Later that year, on September 6, 2007, Smith & Wesson issued a press release reporting the Company's financial results for the first quarter of its 2008 fiscal year. In it, the Company announced that it had experienced "record revenue of $74.4 million for the quarter . . . reflect[ing] an increase of 56.3% over the comparable quarter last year." (*Id.* ¶ 114.) The Company increased its earnings guidance for fiscal year 2008 to $0.63 per share. Defendants Golden and Kelly again participated in a follow-up conference call, in which they discussed the Company's strong first quarter results.

On October 29, 2007, Smith & Wesson issued a press release revealing preliminary financial results for the second quarter of 2008 that showed a significant downturn from the Company's projections. Specifically, Smith & Wesson reduced its earnings guidance from $0.63 per share to $0.53 per share. The Company attributed the decreased projection to "a combination of factors that emerged late in the quarter [including] softness in the market for hunting rifles and shotguns, driven by lower than expected consumer demand, a build-up of pre-season retail inventories, and unseasonably warm autumn weather." (*Id.* ¶ 123.) The news led to a forty-percent decline in the Company's stock price.

On December 6, 2007, Smith & Wesson announced its actual second quarter results and again revised downward its earnings guidance, this time to $0.40 per share. The Company expected net product sales to reach $300 million in fiscal year 2008, a $30 million decrease from its June projection. The Company attributed these lower than expected sales to the factors mentioned in its October 29 press release. This revised guidance caused the Company's stock price to drop an additional twenty-nine percent.

Plaintiffs allege that the Company ignored a number of clear indicators that demand was actually decreasing in the months prior to the positive June and September press releases. They point, for example, to evidence that they contend suggests a build-up of inventory and a failure to meet sales goals during this time. Based on this, they argue that the Company fraudulently misrepresented the level of demand for its products.

## III. *PROCEDURAL BACKGROUND*

Following the consolidation of three related cases on April 15, 2008, Plaintiffs filed an amended complaint containing two counts. As noted, they brought claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against Smith & Wesson, CEO Michael Golden, CFO John Kelly, and Chairman of the Board Barry Monheit. Second, Plaintiffs brought claims against the individual Defendants under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

On March 26, 2009, in response to Defendants' motion, the court dismissed all claims against Defendant Monheit due to absence of sufficient allegations attesting to his involvement in the allegedly false

statements. In its dismissal memorandum, the court also noted that cautionary language rendered "a very large number, probably the majority, of the statements Plaintiffs cite in the complaint" forward-looking and, thus, non-actionable under the "safe harbor" provisions of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–5 ("PSLRA"). *In re Smith & Wesson,* 604 F.Supp.2d 332, 345 (D.Mass.2009). Nonetheless, the court denied the motion to dismiss with respect to all remaining Defendants, holding that Plaintiffs offered "sufficient, albeit thin, allegations of Defendants' intentionally false statements of present or historical fact to survive the motion to dismiss." *Id.* at 335. In particular, the court highlighted statements such as "demand has been strong," "growth in demand exceeded 59%," and "our sales growth was particularly strong," which sufficed to overcome the motion to dismiss even though the statements "may not provide the strongest possible basis for a securities claim." *Id.* at 343.

## IV. *DISCUSSION*

Defendants now seek summary judgment on the remaining allegations involving statements of present or historical fact. Defendants' argument is threefold: (1) Plaintiffs cannot prove that Defendants' statements regarding present and historical demand were false or misleading; (2) Plaintiffs cannot prove that Defendants acted with scienter; and (3) Plaintiffs cannot establish loss causation. Defendants additionally assert that they are entitled to summary judgment on all claims against the individual Defendants because Plaintiffs cannot demonstrate "controlling person" liability under Count II.[2] As noted, Plaintiffs' motion for partial summary

judgment seeks a ruling in their favor on the issue of scienter.

### A. *Applicable Legal Standard.*

Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When the moving party has properly demonstrated the absence of evidence to support the nonmoving party's case, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *Sands v. Ridefilm Corp.,* 212 F.3d 657, 661 (1st Cir.2000) (quoting *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997)). An issue is "genuine" where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). A "material" fact is one that "has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 428 (1st Cir. 1996).

### B. *Defendants' Motion for Summary Judgment (Dkt. No. 171).*

To prove a securities law claim under Section 10(b) of the Exchange Act and Rule 10b–5, Plaintiffs must establish (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) scienter, *i.e.* a wrongful state of mind; (4) reliance on the misrepresentation; (5) economic loss from the misrepresentation; and (6) loss causation.

---

**2.** As with the loss causation argument, Defendants' clear entitlement to summary judgment

on other grounds makes it unnecessary to address this argument.

*See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir.2008). As noted, Defendants argue that evidence of record is insufficient to support a jury finding on the first, third, and sixth elements. For the reasons stated below, this court agrees and, therefore, will allow Defendants' motion with respect to Count I. As claims brought under Section 20(a) are derivative of 10b–5 claims, the court will also allow Defendants' motion as to Count II. *See Hill v. Gozani*, 638 F.3d 40, 53 (1st Cir. 2011) (quoting 15 U.S.C. § 78t(a)) ("[O]nce any 'person' is found liable for violating the Act's substantive provisions, 'every person who, directly or indirectly controls any person liable under any provision of this chapter. shall also be liable jointly and severally . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.' ").

### 1. *Material Misrepresentation or Omission.*

In briefing the present motions, Plaintiffs have narrowed their allegations to several public statements made on June 14, 2007, and September 6, 2007, which, in their view, survived the motion to dismiss and constitute actionable statements of present or historical fact. These statements all contain representations about the demand for the Company's products. The court will address each of these statements in turn below.

Before doing so, however, it is necessary to address one knotty threshold issue, which has been the focus of extensive discovery and which the parties have discussed at length in their briefs. The issue can be summarized as follows: How should a court, in the context of a securities case, treat a company's statements regarding the "demand" for its products? Specifically, what can Defendants be fairly viewed as having conveyed by their use of the term "demand" in their press releases and conference calls in 2007?

In one respect, the word "demand" is not complicated. As Plaintiffs correctly point out, "Demand is, in the end, nothing other than the willingness of customers to purchase a product." (Dkt. No. 187, Pls.' Mem. at 10 (citing Dkt. No. 159, Ex. 2, Conner Decl. ¶¶ 7–8).) Defendants do not challenge this definition, and the court sees no reason to depart from it.

An agreed definition of the word "demand," however, is only the beginning of the discussion of its practical import. The parties disagree sharply about the proper method for measuring demand and, more importantly, about the significance of a company's representation that strong demand existed for its product. The controversy changes shape depending on whether a company's statements about demand can be construed as describing past, current, or future interest in its products.

Measuring past demand is straightforward. By simply calculating product sales and comparing them for different periods, a company can assess demand for a product in prior years, prior quarters, or prior months and offer praise or apologies for its performance. It is clear in the law, and not disputed by the parties here, that when a company lies or misleads the public about this kind of past demand, its misrepresentations (assuming the other elements of a claim, such as loss causation, are satisfied) can form the basis of a securities claim.

Measuring future demand, a process sometimes known as "demand forecasting,"[3] is a more nuanced undertaking,

---

**3.** Although Plaintiffs decline to use the phrase "demand forecasting" or "earnings forecast-

about which the parties strongly disagree. Plaintiffs fault Defendants for employing "top-down" demand forecasting, a method by which senior managers look at recent financial statements in conjunction with current market conditions to generate projections for the future. This method contrasts with a "bottom-up" approach, by which low-level managers gather up-to-the-minute evidence of sales at the grass-roots level in all facets of the business. (*See* Dkt. No. 159, Ex. 2, Conner Decl. ¶ 9.) While Plaintiffs argue that the market expects businesses to use the bottom-up approach, Defendants vigorously defend the top-down approach as reliable and widely used.

This disagreement about how a company should form its predictions about *future* demand—in the context of a securities case generally, but particularly on the record of this case—has limited or no relevance to the analysis of Defendants' motion for summary judgment. As the court has noted, the law generally makes for-ward-looking statements non-actionable. *See Hill v. Gozani,* 638 F.3d 40, 54 (1st Cir.2011) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)) ("[The PSLRA] created a safe-harbor provision [which applies when] the statement is identified as forward-look-ing and is accompanied by 'meaningful cautionary statements identifying impor-tant factors that could cause actual results to differ materially from those in the for-ward-looking statement.' "). This is to say, to the extent that Defendants' statements could be interpreted as forecasting future demand for the Company's products, they are no longer part of this lawsuit. In fact, the Company's "safe harbor" provision identifying forward-looking statements specifically mentions "the demand for the Company's products" as one such protect-ed statement.[4] The "top-down" versus "bottom-up" controversy, since it only per-tains to future predictions, has little appli-cation to descriptions that look backwards.

Of course, distinctions between descrip-tions of past demand (potentially action-able, if false or misleading) and projections of future demand (generally not action-able) may themselves fade in importance if a potential investor is looking for a fair assessment of *current* demand. As will be seen below, since Plaintiffs cannot show that Defendants' descriptions of past de-mand, even to the extent that they bore on the degree of demand current at the time the descriptions were offered, were mis-leading, Defendants are entitled to sum-mary judgment. A review of the specific statements identified by Plaintiffs makes this point clear.

 a. *June 14, 2007 Statements.*

 ■ First, Plaintiffs highlight the fol-lowing statement from a press release is-sued by Defendants on June 14, 2007:

> Certain statements contained in this press release may be deemed to be forward-look-ing statements under federal securities laws, and the Company intends that such forward-looking statements be subject to the safe-harbor created thereby. Such for-ward-looking statements include statements regarding the Company's anticipated sales . . .; *the demand for the Company's products* . . . .")

(Dkt. No. 173, Sten Decl. ¶ 28, Ex. 24 (empha-sis added).) The Company's September 2007 press release contains the same language. (*See* Dkt. No. 173, Sten Decl. ¶ 44, Ex. 39.)

---

ing" in their briefs, their own expert, Robert E. Conner, makes it clear that the parties are disputing the process of gathering informa-tion in order to generate projections about future sales. (*See* Dkt. No. 159, Ex. 2, Conner Decl.) Plaintiffs also rely on the deposition of Thomas Coghill, former Smith & Wesson Op-erations Controller, who similarly discusses perceived flaws in the Company's demand-forecasting process. (*See* Dkt. No. 188, Wood Decl. Ex. 34, 24:17–25:15.)

4. The safe harbor provision included in the Company's June press release reads as fol-lows:

• *The M & P pistol* and tactical rifle series, along with our new shotgun and bolt-action rifle lines, *are expected to be drivers in the sales increase for fiscal 2008.*

(Dkt. No. 187, Pls.' Mem. at 5 (emphasis in original).)

Defendants correctly note that this statement is clearly a forward-looking statement as it describes the Company's expectations concerning future economic performance. *See* 15 U.S.C. § 78u–5(i)(1)(C) (defining "forward-looking statement" as, *inter alia,* a "statement of future economic performance"). As such, this statement was recognized in the court's prior ruling as an improper basis for any claim for relief. *See In re Smith & Wesson,* 604 F.Supp.2d 332, 345 (D.Mass.2009) ("[A]pplication of the cautionary statements prong of the safe harbor is itself sufficient to render Defendants' forward-looking statements non-actionable.").

■ Plaintiffs also point to the following statements made by CFO Kelly during a conference call the same day:

• So as we look in the business, we ended the year with a pretty good backlog. *Demand has been strong.*

• Planned capital expenditures for fiscal 2008 of $17.7 million represent a $1.7 million increase from our previous estimate and allow for an expansion of our polymer pistol [M & P and Sigma] manufacturing capacity *due to increased demand.*

(Dkt. No. 187, Pls.' Mem. at 5 (emphasis in original).)

Defendants contend, as a threshold matter, that these statements are too vague to be actionable and constitute mere "puffery." However, the court has already considered and rejected this argument, holding that "Defendants' statements regarding the strength of past demand . . .

are definite and important to a potential investor" and "are not mere puffery." *In re Smith & Wesson,* 604 F.Supp.2d at 342. The court sees no reason to modify that ruling here.

Defendants next argue, more persuasively, that the statements are not actionable because they are true. Plaintiffs attempt to interpret the phrase "demand has been strong" to be a general statement that they say implies high demand in all aspects of Defendants' business. But CFO Kelly's statement, when read in context, is clearly directed at a particular area of production. The full statement reads as follows:

So as we look in the business, we ended the year [FY 2007] with a pretty good backlog. Demand has been strong, and that's—the Thompson, our capacity in Thompson, we've gotten our barrel output up by 20% in the first whatever its been, five months, that we've had it. So we're putting all those together, and that's why we reacted confidently with our new guidance.

(Dkt. No. 201, Defs.' Reply Mem. at 6.) The above statement is clearly intended to refer to the Company's acquisition of the Thomson/Center Arms facility in January 2007, which generated more than $22.5 million in net sales from January to June. (*Id.*) Because Plaintiffs cannot and do not dispute the fact that the Thompson acquisition created a substantial new revenue stream in early 2007, it cannot be fairly argued that Kelly's statement is misleading.

In the same vein, Plaintiffs have taken an overly broad view of the second highlighted conference call statement, which discusses the Company's intention to increase polymer pistol (the M & P and Sigma models) manufacturing capacity "due to increased demand." Again, it is clear that this statement refers not to com-

pany-wide demand but to the indisputable fact that sales for the M & P pistol, specifically, increased more than four hundred percent in April 2007 over the prior year, from $1,363,000 to $6,267,000, and increased more than two hundred percent in May 2007 over the prior year, from $1,408,000 to $3,260,000. (Dkt. No. 201, Defs.' Reply at 9.)

Even assuming, *dubitante*, that the above statements could be read as general comments on company-wide demand, the undisputed record evidence shows that company-wide sales *had* increased considerably in the months preceding the June 2007 statements. It cannot be disputed that Smith & Wesson's sales in the third quarter of fiscal year 2007 (November 1, 2006—January 31, 2007), the fourth quarter of fiscal year 2007 (February 1, 2007—April 30, 2007), and May 2007 all surpassed sales from the prior fiscal year by a large margin.[5] In the third quarter of fiscal year 2007, net sales increased thirty-nine percent over the prior year, from $38,635,764 to $53,877,676. (Dkt. No. 176, Defs.' Stat. Facts ¶ 42.) In the fourth quarter of fiscal year 2007, net sales increased fifty-nine percent, from $51,852,263 to $82,571,121. (*Id.* ¶ 46.) In May 2007, the month directly preceding the press release and conference call at issue, net sales increased fifty-one percent, from $12,092,000 to $18,346,000. (*Id.* ¶ 49.) These sales increases prompted the June press release discussing the Company's "record annual revenues and earnings." (Dkt. No. 173, Ex. 24.) Plaintiffs cannot and do not dispute these figures. (*See* Dkt. No. 192, Pls.' Resp. Defs.' Stat. Facts ¶¶ Q, S.)

Instead, Plaintiffs argue that the record sales referred to in Defendants' statements actually masked a declining demand for the Company's products current

at the time the statements were made, which Defendants either knew about or should have known about. They point to the following facts of record as evidence of this decline: (1) Smith & Wesson failed to meet its own internal goals prior to the Class Period; (2) Smith & Wesson's sales staff reported a softening in product demand prior to the Class Period; and (3) Defendants were forced to use a number of promotions to generate revenue rapidly at the end of fiscal year 2007. Plaintiffs suggest that these developments should have been recognized, and presumably disclosed, as harbingers of declining demand for the Company's products at the grassroots level. In other words, one might say, although it cannot be disputed that "demand" for the Company's products had increased quite substantially over the very recent past, as Company officials truthfully and accurately reported, evidence at the sales level suggested (Plaintiffs say) that current "demand" was softening, making even accurate descriptions of past demand as a predictor of potential future "demand" misleading.

There are a number of problems with this syllogism. First, the evidence of declining current demand, as of June 2007, was ambiguous. Indeed, inconsistent evidence about Smith & Wesson's success in meeting its internal sales goals in the months preceding the June press release does little to help Plaintiffs. Plaintiffs point to "orderometer reports"—daily reports distributed among upper management discussing the Company's internal sales goals—as evidence that the Company repeatedly failed to fulfill its "shipment commitments." (Dkt. No. 187, Pls.' Mem. at 8.) Plaintiffs also highlight a "Sales by Channel Report," which shows that Smith & Wesson missed its sales targets in all

---

5. Smith & Wesson's fiscal year begins on May 1.

sales channels by roughly nine percent in March 2007. (Dkt. No. 188, Wood Decl. Ex. 14.) In response, Defendants observe that Plaintiffs have manipulated the numbers by excluding the Company's performance in April 2007, in which it surpassed sales targets across *all* channels by forty-six percent. (Dkt. No. 202, Sten Decl. Ex. 66.) This exceptional performance in April 2007 pushed the Company's total fourth quarter sales passed its sales targets by more than twelve percent. (*Id.*) In other words, the data as of June 2007 regarding current sales contained, as it frequently does, both light and shadow, at best.

More important than whether the Company actually exceeded its internal sales targets, however, is the fact that these were *targets.* Corporations, including Smith & Wesson, purposefully set high sales targets in order to encourage growth. The fact that Smith & Wesson may have fallen short of some of its sales goals (while exceeding others) is not, in itself, cause for alarm. In fact, if the Company consistently surpassed all its goals, it could be faulted for placing them artificially low. In any event, the failure to meet internal sales goals does not necessarily indicate declining demand for the Company's products. More to the point, these shortfalls do not constitute the sort of flashing red lights that rendered Defendants' indisputably accurate descriptions of past performance misleading.

Plaintiffs also highlight various statements made in "call reports"—monthly reports by sales managers summarizing feedback from retailers and distributors—as evidence of declining current demand. For instance, according to one call report, "one dealer's manager stated that his M & Ps had not been moving that well," and, according to another, "business has decreased in sales and traffic in the past 2 weeks due to the increased price of gaso-line and the extreme draught [sic] in this area." (Dkt. No. 187, Pls.' Mem. at 11.) Again, Plaintiffs appear to be cherry picking the record, and Defendants easily counter these more pessimistic excerpts with a number of statements from call reports during the same period indicating strong demand. (*See* Dkt. No. 201, Defs.' Reply at 12 n. 15.)

The court need not wade into this bramble of conflicting evidence in order to rule on Defendants' motion. The isolated remarks Plaintiffs cite fail to undermine Defendants' statements that the Company was experiencing strong demand for its products in the months leading up to the June statements. Plaintiffs fail to explain how the conflicting call reports compromised the true statements describing actual sales figures so drastically as to make these accurate reports false or misleading.

Plaintiffs' identification of promotional initiatives by Defendants is similarly unavailing. According to Plaintiffs, these efforts revealed a desperate desire to generate revenue in the face of declining demand. Specifically, they point to Defendants' use of "pull-ins," in which a seller offers incentives to potential buyers to make short-term purchases, thereby allowing the Company to "pull" the sales into an earlier reporting period. However, as one court has found, "[w]hile they may be emblematic of American business' habitual tendency toward short-term views, 'pull-ins' are not the nefariously manipulative scheme that plaintiffs make them out to be." *In re Viewlogic Sys. Sec. Litig.,* 1996 U.S. Dist. LEXIS 22371, *7–8 (D.Mass.1996) (quoting *In re Cypress Semiconductor Sec. Litig.,* 891 F.Supp. 1369, 1381 (N.D.Cal.1995)). In fact, pull-ins "are treated no differently than any other sale." *Id.*

Plaintiffs admit that pull-ins are widely used, but they speculate that in this case they must have been intended by Defendants to camouflage declining demand. The absence of any explanation as to how these promotions differed in any meaningful way from those used by the Company in previous years or those used by competitors takes the air out of this argument entirely. Plaintiffs' characterizations of these promotions as "overly generous," "abnormally large," "outrageous," and "a discounting frenzy," (Dkt. No. 187, Pls.' Mem. at 16–18), are simply efforts to achieve by rhetoric what the facts will not support.

In sum, Plaintiffs' claims concerning the June statements fail because the undisputed evidence shows that those statements were, in fact, true. *Cf. Carney v. Cambridge Tech. Partners, Inc.*, 135 F.Supp.2d 235, 251 (D.Mass.2001) (noting "[t]he accurate reporting of historical information cannot be the basis for a securities fraud claim"); *In re Boston Tech. Sec. Litig.*, 8 F.Supp.2d 43, 61 (D.Mass.1998) (concluding "the announcement of earnings for the preceding quarter is no basis for 10b–5 liability"). The Company posted record sales in the months leading up to the June press release and conference call, in which Defendants made various statements about the strong demand for their products. No reasonable jury could rely on the inconsistent wisps of evidence identified by Plaintiffs to conclude that these indisputably true statements were false or misleading.

b. *September 6, 2007 Statements.*

■ Plaintiffs also highlight a series of statements made in a press release and conference call on September 6, 2007. The relevant portion of the press release reads as follows:

- We continue to expect revenue to increase to approximately $330 million in fiscal 2008, which would represent a 40% increase over fiscal 2007 revenue. . . . *Sales of our M & P Pistols, . . . are all expected to be key drivers of the revenue increase for fiscal 2008.* We expect second quarter revenue to increase by approximately 60% over revenue in second quarter of fiscal 2007, *driven by continued expansion in our existing markets* . . . .;

(Dkt. No. 187, Pls.' Mem. at 6.)

First, the vagueness of the phrase "continued expansion in our existing markets," while not conclusive of the matter, creates a high hurdle for Plaintiffs to overcome if they are to prove its falsity. More importantly, Defendants note that this statement fell under the heading "Outlook for Fiscal 2008." This fact, in conjunction with the repeated use of the term "expects," indicates that the statement is forward-looking and, thus, not actionable. *See* 15 U.S.C. § 78u–5(i)(1)(C). Accordingly, Defendants are entitled to summary judgment on this issue.

■ Plaintiffs also point to the following four statements made by Defendant Kelly during a conference call the same day:

- To recap, we continued to deliver double-digit growth in year-over-year quarterly revenue, *supported by strong sales into the retail channel* and our ongoing penetration in law enforcement . . . [a]nd we are raising our expectations for the full year net income;

- *The results we delivered this quarter in the retail channel reflect growth in our core handgun business* . . . .;

- I want to point out that *our sales growth was strong during the first quarter*, given that it compares to some major events that occurred in the comparable quarter in the prior year;

- *[C]ertainly the M & P is driving and has been driving our growth in pistols.*

(Dkt. No. 187, Pls.' Mem. at 6 (emphasis in original).)

Unlike the press release excerpt, these four statements comment on present or historical facts. Still, they cannot form the basis for a securities fraud claim largely for the same reasons discussed above: Smith & Wesson continued to experience record sales in the months preceding the September conference call. In the first quarter of fiscal year 2008 (May 1—July 31, 2007), the Company recorded revenue of $74.4 million, an increase of fifty-six percent over the first quarter of fiscal year 2007. (Dkt. No. 173, Sten Decl. ¶ 35, Ex. 30.) Gross profits over that period grew sixty-three percent over the prior year, from $16.6 million to $27.2 million. (*Id.*)

■ These undeniably strong numbers undercut Plaintiffs' allegations with respect to the first and the third excerpted statements, which only discuss sales in general terms. The second statement, which concerns growth in the Company's "core handgun business," and the fourth statement, which mentions the M & P product line, are more precise and warrant further analysis. Still, the outcome is the same.

It is undisputed that "[t]he actual sales figure for the first quarter of fiscal year 2008 for the Company's core handgun business (consisting of revolvers, pistols and M & P pistols) was $35,915,000.00, compared to $30,705,000.00 for the first quarter of the previous year." (Dkt. No. 176, Defs.' Stat. Facts at ¶ 63; Dkt. No. 192, Pls.' Resp. to Defs.' Stat. Facts at ¶ W.) With respect to the M & P product line in particular, sales increased more than sixty percent, from $5 million to $8.2

million. (Dkt. No. 173, Sten Decl. ¶ 36, Ex. 31.)

Although Plaintiffs do not challenge these numbers, they contend that the market interpreted Defendants' statements as referring not only to the results from the previous quarter, but also to the level of demand at the time the statements were made. In other words, Plaintiffs suggest that the market could reasonably interpret the September statements as commenting on the preliminary results from the second quarter—specifically, the month of August—in addition to first quarter results. And, Plaintiffs say, because sales fell dramatically in August, the Company's optimistic statements in September were misleading.

Defendants do not dispute that the Company experienced a sharp drop in sales in August. Net sales decreased by roughly one third from the previous August, from $12,184,000 to $8,595,000. (Dkt. No. 176, Defs.' Stat. Facts ¶ 72.) Gross profits dropped by more than half, from $2,736,000 to $1,240,000. (*Id.*)

■ Nonetheless, Plaintiffs' argument fails because the September statements did not address August sales. In fact, the September press release and conference call were clearly directed at Smith & Wesson's first quarter results. The title of the press release alone is revealing: "Smith & Wesson Holding Corporation Posts Record First Quarter Revenues and Profits." (Dkt. No. 173, Sten Decl. ¶ 44, Ex. 39.) In addition, the statements contained in the press release repeatedly refer to first quarter results, and Plaintiffs have identified no statements referring to preliminary second quarter results or August sales figures.[6]

---

6. Although Plaintiffs frame their argument in terms of alleged misstatements, their allegations also fail insofar as they imply that Defendants' omission of the above information

was fraudulent. For an omission to be material and therefore fraudulent, there must exist "a substantial likelihood that the disclosure of the omitted fact would have been viewed by

The same is true for the statements excerpted from the September conference call, as set forth above. The one statement that arguably could be interpreted as a statement of present demand, thus implicating August's sales, is Defendant Golden's comment that the M & P product line "is driving, and has been driving our growth in pistols." (Dkt. No. 173, Sten Decl. ¶ 45, Ex. 40.) Yet, even this statement, when considered in context, clearly refers to first quarter results. The relevant exchange between Defendant Golden and Reed Anderson of D.A. Davison & Co. reads as follows:

Q: (Anderson) [Are] the newer models driving [growth in handguns] or are you still seeing the stuff you'd introduced a year or two ago actually growing year-over-year as well?

A: (Golden) Well, the M & P was up 63%.

Q: (Anderson) Okay.

A: (Golden) So certainly the M & P is driving, and has been driving our growth in pistols.

(*Id.*) As noted above, the record evidence shows that these statements are, quite simply, true. (Dkt. No. 173, Sten Decl. ¶ 36, Ex. 31.) Thus, a reasonable jury could not conclude that the September statements were false or misleading. Because Plaintiffs' proof fails as to the first element of Count I, and because Count II is a derivative claim, Defendants' motion for summary judgment must be allowed on both counts.

### 2. *Scienter.*

Even if the record contained enough evidence to generate a disputed issue of fact regarding a material misrepresentation or omission, the absence of adequate evidence, direct or inferential, of Defendants' culpable state of mind would, independently, be fatal to Plaintiffs' claims.

 To satisfy the requirement of scienter, Plaintiffs must establish that Defendants acted with "conscious intent to defraud" or a "high degree of recklessness." *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 58 (1st Cir.2008). The burden on Plaintiffs to show this is heavy. Recklessness means "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care … *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir.1999) (citation omitted). Like materiality, " 'scienter [is a] fact-specific issue which should ordinarily be left to the trier of fact.' " *Wells v. Monarch Capital Corp.,* 129 F.3d 1253 (Table), 1997 WL 693032, at *4 (1st Cir.1997) (quoting *In re Apple Comp. Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)). However, "summary judgment is not automatically precluded even in

---

the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398 (2011) (citations and quotation marks omitted). In other words, "a company must reveal only those facts that are needed so that what was revealed would not be *so incomplete as to mislead.*" *Hill v. Gozani,* 638 F.3d 40, 57 (1st Cir.2011) (citation and quotation marks omitted) (emphasis in original). Omitting early, conflicting indicators of second quarter sales from a first quarter press release does not undermine that document's

completeness in any way, let alone render it so incomplete as to mislead. Here, as in *Hill,* the undisclosed information does not "even approach the widely accepted certainty of failure or the comprehensive cover-up" found in cases involving actionable omissions. *Id.* at 59. *See generally Matrixx Initiatives, Inc.,* 2011 WL 977060, at *8 (observing that the Court has been "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information") (citations and quotation marks omitted).

cases where motive or intent are at issue," and the First Circuit has granted summary judgment "based on a lack of concrete evidence that would allow for an inference of fraudulent intent." *Id.*

To prove scienter, Plaintiffs first argue that Defendants made earnings projections that "were not based on an analysis of *current* demand for the Company's products." (Dkt. No. 187, Pls.' Mem. at 30 (emphasis in original).) In support, Plaintiffs rely on deposition testimony of Defendants' expert, Dr. Craig Moore. When asked whether the Company conducted an analysis of the current state of demand for Smith & Wesson's products prior to making the June statements, he answered, "To the best of my knowledge, there was no statistical or technical analysis undertaken for that, no." (Dkt. No. 159, Wood Decl. Ex. 1, Moore Dep. at 214:9–17.) When asked whether the Company's earnings guidance was based on an analysis of the current demand for the Company's products, Dr. Moore answered, "To the best of my knowledge, they were not." (*Id.* at 216:6–10.) These rather qualified opinions, in themselves, provide inadequate support for any hypothetical jury's conclusion that Defendants conduct constituted an "extreme departure" from the applicable standard of care.

Dr. Moore's offerings, even in combination with other evidence identified by Plaintiffs, fall far short of the necessary quantum of record evidence to avoid summary judgment. The heart of Plaintiffs' argument is their criticism of Defendants' demand forecasting methodology. They contend that Defendants' optimistic earnings guidance (*i.e.*, projections of future demand) were recklessly provided because the Company failed to conduct a "bottom-up" survey of current demand for the Company's products. As noted above, Defendants did not use this approach to fore-

casting but employed the "top-down" process. At the risk of repetition, the court must again observe that this disagreement about effective corporate management is a red herring. Future projections are forward-looking and, thus, non-actionable under the "safe harbor" provisions of the PSLRA, 15 U.S.C. § 78u–5. *See In re Smith & Wesson,* 604 F.Supp.2d 332, 345 (D.Mass.2009). The material issue here is not whether Defendants acted recklessly by providing future earnings projections, but whether Defendants made false or misleading statements concerning past or current demand for their products.

On this latter point, Plaintiffs assert that a jury could infer scienter from Defendants' failure to disclose evidence of declining demand already within their possession in June and September of 2007. As the discussion above demonstrated, while it is true that some scraps of information suggested the beginnings of a possible decline in demand at the time the statements were made, other information suggested to the contrary. In this ambiguous climate, Defendants' true statements about past sales cannot be seen as misleading.

The First Circuit has been quite clear on this. The key question in this sort of securities case is "whether defendants knew or should have known that their failure to disclose those facts 'present[ed] a danger of misleading buyers or sellers.'" *City of Dearborn Heights v. Waters Corp.,* 632 F.3d 751, 758 (1st Cir.2010) (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir.1999)). "If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." *Id.* at 757.

Plaintiffs argue that Defendants should have disclosed signs of decreasing demand, such as call reports, missed sales targets,

and discounting programs. However, as explained above, these supposed "facts," fairly viewed in context, are too inconsistent to render accurate statements about undisputed sales figures misleading. The evidence of record confirms substantial growth throughout the fourth quarter of fiscal year 2007 and the first quarter of fiscal year 2008—the respective subjects of the June and September press releases. The absence of information about call reports, sales targets, and discounting programs cannot rise, as a matter of law, to the level of a material omission.

Finally, Plaintiffs assert that Defendants' failure to disclose evidence of weak August sales in the September press release and conference call could be found to reflect Defendants' culpable state of mind. Plaintiffs point to Smith & Wesson's "bloated inventory" in the summer of 2007 as evidence that should have indicated to the Company that its products were not selling. (Dkt. No. 187, Pls.' Mem. at 33.)

Once more Plaintiffs' argument selectively focuses on the shadows in the commercial landscape without recognizing the sunnier elements. In fact, the reports of weak second quarter sales and high inventory levels were both conflicting and uncertain. It is true that the record contains evidence of communications among the individual Defendants that might be interpreted as showing their knowledge of the early second quarter drop in sales. Plaintiffs highlight an August 20, 2007, email from Defendant Kelly to President of Firearms Leland Nichols:

> [I]t looks like we will have net sales of about $16 million for the month and *miss the profit target by at least three to four cents. In order to hit our targets, we need to do $75 million in sales in Sept/Oct.* [Dineen], check last year's numbers what did S & W do in sales in

August last year. We may not even be ahead of last year. *Ouch.*

(Dkt. No. 188, Wood Decl. Ex. 55 (emphasis added).) Later that day Defendant Kelly sent a second email:

> *On the surface it seems like we are digging a deep hole to start the quarter* .... We are going to have to give some form of guidance (probably a range) for Q2 with the earnings release. Not pulling the fire alarm, but given how much Q2 is supposed to improve over last year *we are going to have to provide some guidance and with the way August is coming out of the gate, it is going to make it more difficult for to [sic] project the quarter.*

(Dkt. No. 188, Wood Decl. Ex. 56 (emphasis added).)

Plaintiffs also point to notes taken at an August 29, 2007, "business review" meeting attended by senior managers, including Defendants Golden and Kelly, specifically the comments, "We're seeing standard margins for the quarter slightly below plan, but *when we look at month [sic] it is more dramatic erosion,*" and "Industry is growing by 15–17% and *we're shrinking.*" (Dkt. No. 188, Wood Decl. Ex. 58 (emphasis added).)

All this, taken by itself, might justify inferences helpful to Plaintiffs' case. But this was not nearly all. Defendants point to evidence from the same period demonstrating, at worst, concern among the Company's executives about meeting second quarter sales targets and, at best, continued optimism. The August 29 meeting notes, along with the gloomier elements, contained the following encouraging information: (1) "Walther is over plan"; (2) "Consumer [the area at issue here] is above plan" and "consumer was slightly over plan"; (3) "Revolvers over [plan]"; (4) "Order flow is strong now"; (5) "Feedback [from Distributors] so far is

spotty, some guys up, some guys flat"; (6) "[w]e have inventory to support additional orders, and we have programs to drive those sales"; and (7) "Big boxes sell what they got, and if we put it there, they'll sell it." (Dkt. No. 188, Wood Decl. Ex. 58.)

Significantly, in a September 15, 2007, email (sent *after* the September press release and conference call) Defendant Golden expressed his surprise about the low sales figures in August:

> I am flying to Phoenix and just, for the first time had a chance to review the August final results. I would like to understand what happened cost and expense wise in the month. This is the first month in a few years we have lost money.

(Dkt. No. 173, Sten Decl. ¶ 46, Ex. 41.) Leland Nichols responded the next day, summing up Defendant Golden's email with the statement "unless we get it together, we will miss the quarter." (Id. ¶ 47, Ex. 42.)

It is a rare company that is not facing difficulties at almost every point in its corporate life. Executives inevitably will be communicating their concerns about these challenges. It would be grossly unfair to Defendants, and contrary to law, in assessing whether a company and its management acted with a culpable state of mind, to fix exclusively upon expressions of anxiety while ignoring simultaneous expressions of hopeful anticipation. The picture that emerges from a comprehensive look at the communications among Defendants at the relevant time period is decidedly mixed, and far below the standard of proof for scienter.

In this regard it is proper to note that the Company invested more than $14.6 million in expanding its infrastructure during 2006 and 2007, and more than $17.7 million in capital expenditures in fiscal year 2008. (Dkt. No. 201, Defs.' Reply Mem. at 30.) Courts have recognized that such investments do support arguments seeking to rebut claims of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir.1994) (affirming district court's conclusion that plaintiffs had not established scienter where "efforts to continue [the company's] expansion, including increased expenditures on advertising and product development, evince[d] their good faith belief in [the company's] prospects for success").

█ In the end, Plaintiffs can point to no more than conflicting evidence of the Company's performance in the weeks immediately preceding the September press release. As explained earlier, the press release and conference call were directed solely at the Company's undeniably strong fourth quarter results. Moreover, "[a] company does not commit securities fraud merely by failing to disclose all non-public material information that it knows." *City of Dearborn Heights v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir.2010). Thus, given the "lack of concrete evidence that would allow for an inference of fraudulent intent," summary judgment in Defendants' favor is required, on the independent ground that Plaintiffs cannot show the required level of scienter. *Wells v. Monarch Capital Corp.*, 129 F.3d 1253 (Table), 1997 WL 693032, at *4 (1st Cir.1997).

### 3. *Loss Causation.*

Although the evidence supporting loss causation is weak and might well provide an independent basis for summary judgment, the court need not address this alleged deficiency in Plaintiffs' arguments given the above rulings.

### C. *Remaining Motions to Strike.*

Both parties have also filed motions to strike expert testimony. Given the court's rulings on the motions for summary judgment, the motions to strike are now moot and will be denied.

## V. *CONCLUSION*

Plaintiffs' counsel have done a superb job of making the most of what the record offers, but it is not nearly enough. For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 171) is hereby ALLOWED, and Plaintiffs' Cross Motion for Partial Summary Judgment (Dkt. No. 189) is hereby DENIED. Plaintiffs' Motion in Limine to Strike the Rebuttal Expert Report of David I. Tabak (Dkt. No. 185) and Defendants' Motion to Strike Inadmissible Evidence (Dkt. No. 198) are DENIED AS MOOT. The clerk will enter judgment for Defendants in all three cases. These cases may now be closed.

It is So Ordered.